IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAROLYN L. TUCKER, | : | |
| | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. 1:CV-00-1738 |
| v. | : | |
| | : | (Judge Kane) |
| PROVIDENT LIFE AND ACCIDENT | : | |
| INSURANCE COMPANY, | : | |
| | : | |
| Defendant | : | |

FILED
HARRISBURG

MAR 2 9 2002

MARY E. D'ANDREA, CLERK
Per_____
  DEPUTY CLERK

**MEMORANDUM AND ORDER**

Pending before the Court are cross-motions for summary judgment. The motions have been fully briefed and are ripe for disposition. For the reasons discussed below the Court will grant Defendant's motion, deny Plaintiff's motion, and enter judgment accordingly.

Plaintiff filed this action in the Court of Common Pleas of Dauphin County, Pennsylvania, on August 30, 2000. On September 29, 2000, Defendants removed the case to this Court under 28 U.S.C. § 1441. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 since the parties are diverse and the amount in controversy exceeds $75,000.

**I    Standard of Review**

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-51 (1986). The Court must view all facts and inferences in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574,

587 (1986). See also Williams v. Perry, 907 F.Supp. 838, 842 (M.D. Pa. 1995).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in the complaint. Instead, [it] must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (internal quotations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." Id. at 322.

## II.    Background

Plaintiff, Carolyn L. Tucker ("Tucker"), filed this suit[1] as the named beneficiary of Alvin P. Cauley's ("Cauley") group life insurance policy (policy number P-374-0213) ("Group Policy"). Defendant, Provident Life and Accident Insurance Company ("Provident") issued the Group Policy to Cauley's employer, the Bipartisan Management Committee of the Pennsylvania House of Representatives ("Bipartisan Committee"). Cauley was granted coverage under the Group Policy and premium payments were continually remitted up to his death on October 23, 1999. These payments were deducted from Cauley's paycheck or, when Cauley was not on the payroll, were made from Cauley's personal funds.

For the eleven months prior to his death, Cauley remained away from work due to an illness. It is the interpretation of the events that occurred during this eleven month period that are the source of this suit. While the parties dispute the specific labels and consequences attached to

---

[1] The parties do not dispute that Plaintiff's application for benefits was timely and all administrative appeals have been exhausted.

each of these events, the following time line reflects the facts upon which the parties agree:

| | |
|---|---|
| 12/09/98 | Cauley's last day of work.[2] |
| 12/10/98 - 01/25/99 | Cauley is on sick leave[3] but remains on the payroll through the use of his own accumulated sick leave time. |
| 01/26/99 - 05/04/99 | Cauley has exhausted his own sick leave but he remains on the payroll at the direction of the Chief Clerk of the House of Representatives. The time is paid for by sick leave donated at a later time by Cauley's co-workers. |
| 05/04/99 - 06/29/99 | Cauley is on family and medical leave[4] and off the payroll during this time period. |
| 06/30/99 - 09/30/99 | Cauley, although not at work, returned to the payroll using accumulated sick leave donated by his co-workers. (Some of the sick leave donated at this time was used to cover the earlier period Cauley remained on the payroll from 1/26/99 - 5/4/99.) |
| 10/01/99 | Cauley is taken off the payroll and no longer considers himself an employee of the Bipartisan Committee.[5] |
| 10/23/99 | Cauley died without converting his group coverage to an individual policy and without ever receiving notice of his conversion rights. |

---

[2] The parties dispute whether or not Cauley remained "actively at work," as defined by the Group Policy, after this date.

[3] The parties dispute whether or not this "sick leave" is considered a "leave of absence" under the Group Policy.

[4] The parties dispute whether or not this "family and medical leave" was taken pursuant to the federal Family and Medical Leave Act of 1993 or the family and medical leave under the CORE Personnel Policies and Procedures of the Bipartisan Committee.

[5] In her statement of undisputed facts Tucker avers that Cauley resigned on September 30, 1999, the date he met the ten years of service requirement for pension considerations. In its reply to Plaintiff's statement of undisputed facts Provident admitted only that Cauley remained on the payroll until this time so he could qualify for retiree benefits and denied any implication that his resignation indicated he was covered by the Group Policy until that time.

### III.  Discussion

The ultimate question before this Court is whether or not Tucker, Cauley's Group Policy beneficiary, is entitled to the $200,000 benefit. The resolution of this question centers around the conversion clause contained in the Group Policy. The conversion clause allows an insured to convert his or her group life insurance to an individual policy within thirty-one days, "if their life insurance ends because their employment ends or because they leave the Eligible Class." Group Policy at 11 (Plaintiff's Exhibit A). If the insured dies during the conversion period Provident will pay a benefit equal to that which could have been converted.

In answering the above question this Court must address two issues. First, did Cauley remain covered under the terms of the Group Policy throughout the eleven month period prior to his death and, therefore, did he die within the applicable conversion period?[6] Second, if Cauley did not remain covered during the eleven month period, does the fact that he failed to receive notice of his conversion rights prevent Provident from denying Tucker the benefits she would have received had Cauley converted his coverage? In addressing each of these issues this Court must decide how the Pennsylvania Supreme Court would rule if presented with the same issues. See 2-J Corp. v. Tice, 126 F.3d 539, 541 (3d Cir. 1997). Unfortunately, little Pennsylvania precedent is available to guide that determination.

### A.  When coverage terminated under the terms of the Group Policy

When read together, the provisions of the Group Policy create three situations for

---

[6] The Group Policy gives Cauley thirty-one days to convert his group coverage to individual coverage. Because Cauley never received notice of his conversion rights, Title 40, section 532.7 of the Pennsylvania Statutes allows him sixty additional days to convert. Harris v. St. Christopher's Hosp. for Children, 436 A.2d 203 (Pa. Super. Ct. 1981). Therefore, Cauley had to remain covered by the terms of the policy through part of August 1999, in order to have died within the applicable conversion period. See discussion, infra, p.10, section III B.

4

continued coverage that are relevant to this case. First, an insured remains covered until one of the Group Policy's termination provisions are triggered. See Group Policy at 16. As discussed in the next section, these provisions essentially create an active employment requirement. Second, if the insured does not remain actively employed, he or she can remain covered for two weeks, "[i]f Covered Persons' employment ends because of lay-off, strike, leave of absence (other than for active military service), or disability." Group Policy at 16. Third, if an insured does not remain actively employed, he or she can remain covered for a period of time during a family and medical leave.

### 1. Active Employment Requirement

Provident argues that Cauley had to remain actively at work to continue his coverage. Tucker, on the other hand, argues that the actively at work requirement applied only to Cauley's initial eligibility for coverage. While several provisions support Tucker's argument that the Group Policy's actively at work requirement applies only to the time insurance starts,[7] a careful reading of other provisions in the Group Policy indicates that an active employment requirement continues and applies to this case. The Group Policy defines actively at work/active work as when, "Covered Persons are performing their regular job duties for the Employer and they have completed one full day at work on the immediately preceding work day." Group Policy at 16. The Group Policy requires an employee to be actively at work for any increase in his or her insurance to be effective and the active work requirement is waived for an employee on family and medical leave. See Group Policy at 16-17. Contrary to Tucker's position, these are both

---

[7] "To be eligible for coverage, employees must: . . . (b) be an Eligible Person; . . . . To be an Eligible Person, employees must . . . [1] be an employee Actively at Work for the Employer". Group Policy at 3. Additionally, an employee must be actively at work for insurance to start. Group Policy at 16.

5

events that occur after initial eligibility is decided.

More importantly, under the Group Policy's termination provisions, "Covered Persons' insurance for any benefit will end on the earliest of the following dates: . . . [3] the last day of the calendar month during which they leave the Eligible Class; . . . [6] the last day of the calendar month during which their active full-time employment with the Employer ends." Group Policy at 16. Eligible Class is defined as "[a]ll active full-time employees and contract employees with 6 months of employment." Group Policy at 3. While these termination provisions do not use the defined term of actively at work/active work, the provisions clearly indicate that active employment is a requirement for continued coverage. An insured leaves the eligible class when he or she is no longer an *active full-time employee* and coverage ends when *active full-time employment* ends.

Since Cauley had to remain an active employee, this Court must now determine the definition of "active full-time employment" and whether or not Cauley's active full-time employment ended so as to terminate his coverage. Tucker argues for a definition related to the insured's status on the payroll (paid versus unpaid leave). In support of her position, Tucker points to the Eleventh Circuit's opinion in United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am. 894 F.2d 1555 (11th Cir. 1990). In Sun Life, the court found the active employment requirement to be ambiguous because it did not distinguish between employees who were on vacation or temporary sick leave and employees who permanently left work. Id. at 1565. The court found it unreasonable to assume that the parties contracted for coverage that would terminate the first week the employee failed to be at work performing his or her job for thirty hours. Id.

The court's concerns in Sun Life are not present in this case. First, the sick leave in

6

question is not a short term leave, it is one that spanned ten months. Second, an employee's coverage does not terminate the moment he or she fails to work thirty or more hours in a given week. Employees on a leave of absence are entitled to two weeks of continued coverage and an even longer period if the insured is on family and medical leave. These time periods correlate with the usual vacation and leave times afforded employees and an employer can negotiate for a longer leave of absence period if it so desires.[8] Lastly, an insured whose coverage has terminated can convert his or her group coverage into individual coverage and the Group Policy gives the insured thirty-one days to do so.

Contrary to Tucker's position, the common understanding of the word "active" indicates some type of movement or performance as opposed to passively collecting a pay check. In at least three cases the Pennsylvania Court of Common Pleas has held that the plain meaning of actively employed and/or active employment excluded employees on disability and sick leave. Clark v. Washington Nat. Ins. Co., 6 Pa. D. & C.3d 178 (Pa. Ct. Com. Pl. 1978); Demito v. Life Ins. Co. of N. Am., 11 Pa. D. & C.3d 465 (Pa. Ct. Com. Pl. 1979); Boback v. W. Sav. Fund Soc. of Philadelphia, 19 Pa. D. & C.3d 243 (Pa. Ct. Com. Pl. 1980). These cases are persuasive indications of how the Pennsylvania Supreme Court would rule if presented with the facts of this case. Similarly, the Eight Circuit has held that a person confined to a hospital bed for two months was not actively at work under the ordinary use of the phrase, even though the individual continued to receive a salary. Todd v. Dow Chemical Co. 760 F.2d 192, 193-94 (8th Cir. 1985).

Under the plain and ordinary meaning of active full-time employment Cauley's coverage terminated on December 31, 1998, the last day of the month in which he was physically at work

---

[8] After this claim was made the Bipartisan Committee amended the Group Policy to extend the leave of absence period to twelve months.

7

performing his job. Coverage termination on this date means Cauley's death occurred long after the applicable conversion period, even with the sixty day statutory extension. See Pa. Cons. Stat. Ann. tit. 40, § 532.7 (West 1999).

### 2.     Leave of Absence Exception

Even though Cauley was no longer an active employee as of December 9, 1998, his coverage would be extended for two weeks if he was on a leave of absence. Interestingly, Tucker does not argue that Cauley was on a leave of absence. Instead, Tucker asks this Court to construe the active work requirement and the leave of absence provision so as to create a "twilight zone" of coverage spanning Cauley's ten months away from work.[9] This Court will not torture the policy language to create the ambiguities Tucker suggests. See Niagra Fire Ins. Co. v. Pepicelli, Pepicelli, Watts, and Young, P.C. 821 F.2d 216, 220 (3d Cir. 1987).

Therefore, the leave of absence argument requires little discussion because deciding whether or not Cauley was on a leave of absence does not change the fact that he died well after the applicable conversion period ended. Assuming the best possible scenario for Cauley, that he was on a leave of absence, received the two weeks of coverage in addition to coverage lasting until the end of the month under the active full-time employment provision, and was entitled to the sixty-day conversion extension, his conversion time clock began on January 14, 1999, and

---

[9] Tucker asks this Court to interpret the active work provision as applying only to initial eligibility and to interpret any active employment requirement and the leave of absence provision as applying only to individuals not on the payroll. In advocating for this construction, Tucker attempted to create a twilight zone of coverage from 12/9/98 through 5/4/99 during which Cauley did not have to be performing his job duties but was not on a leave of absence, thereby failing to trigger any of the Group Policy's termination time clocks. However, for Tucker to receive benefits under this theory the Court would have to take yet another leap and determine that after Cauley's family and medical leave ended on 6/29/99, he slipped back into the twilight zone until which point he would have died within the applicable conversion period.

8

lapsed well before his death on October 23, 1999.

### 3. Family and Medical Leave Exception

In light of the prior two discussions, the family and medical leave argument benefits Tucker only if the Court finds: (1) that Cauley actually went on family and medical leave well before the undisputed May 4, 1999 date, (2) that the family and medical leave under the Bipartisan Committee's CORE Personnel Policies and Procedures ("CORE FML") is a state-mandated family and medical leave act/law, (3) that the Group Policy allowed Cauley to combine both the federal Family and Medical Leave ("FMLA of 1993") and the CORE FML for a total of thirty-six weeks of family and medical leave,[10] and (4) that Cauley was entitled to the sixty-day statutory extension of his conversion period. See 29 U.S.C. § 2612 (1999); Pa. Stat. Ann. tit. 40, § 532.7 (West 1999).

This argument can be disposed of after consideration of the first issue. While the parties do not dispute that Cauley was on a family and medical leave from 5/4/99 - 6/29/99, Tucker argues that Cauley's status prior to May 1999, can also be defined as a family and medical leave. The Group Policy defines family and medical leave as, "a leave of absence taken under the terms of the Family and Medical Leave Act of 1993 or a leave of absence taken under the terms of any state-mandated family and medical leave act or law." Group Policy at 17. Leaving aside the issue of whether or not CORE FML is a state-mandated family and medical leave act/law, Tucker has failed to submit any evidence that Cauley began family and medical leave on a date prior to May 4, 1999. The Bipartisan Committee's CORE FML requires the employee to make a

---

[10] The FMLA of 1993 allows up to twelve weeks of leave during any twelve month period. See 29 U.S.C.A. § 2612 (1999). CORE FML allows up to twenty-four weeks of family and medical leave.

9

written request for leave with proof of the illness. CORE at 21, 24 (Plaintiff's Exhibit B). Tucker has provided no evidence that Cauley made a written request for the initial CORE FML or a request for additional CORE FML prior to the undisputed May 4, 1999 date.

Instead, Tucker argues that the CORE sick leave provision qualifies under the Group Policy's family and medical leave exception. See CORE at 17. Unlike CORE FML, CORE sick leave does not appear to require a written request. However, this argument fails because the Group Policy specifically requires that the leave be a state-mandated *family and medical leave*. The CORE Personnel Policies and Procedures has a specific family and medical leave provision and there is no evidence that Cauley met those requirements prior to May 1999. Therefore, the family and medical leave exception fails to aid Tucker's claim for benefits.

### B.     The significance of failing to receive notice of conversion rights

Having determined that Cauley's coverage ended in mid January 1999 at the latest, this Court must now consider the effect, if any, of Cauley's failure to receive notice. Title 40 section 532.7 of the Pennsylvania Statutes entitles the insured to sixty additional days to convert a group policy to an individual policy when the insured did not receive notice of his or her conversion rights at least fifteen days before the policy's conversion period expired. See Pa. Stat. Ann. tit. 40, § 532.7 (West 1999); Harris v. St. Christopher's Hosp. for Children, 436 A.2d 203 (Pa. Super. Ct. 1981) (holding that the sixty day statutory extension was in addition to the thirty-one day conversion period under the terms of the policy, giving the insured a total of ninety-one days to convert the group policy to an individual policy). However, the statute states that, "in no event shall such additional period extend beyond sixty days next after the expiration date of the period provided in such policy." Pa. Stat. Ann. tit. 40, § 532.7.

Both Harris and McGinnis support the position that Provident is not liable for benefits

because the applicable conversion period has ended. Harris, 436 A.2d 203; McGinnis v. Bankers Life Co., 334 N.Y.S. 2d 270 (N.Y. App. Div. 1972). In Harris, the insured died seventy-one days after the termination of her employment, but the beneficiary was entitled to the life insurance benefits because the insured died within the applicable ninety-one day conversion period. Harris, 436 A.2d at 206. Citing McGinnis, the court goes on to state that its holding would have been different had the insured died after the conversion period expired. Id. The above cases are persuasive indications of how the Pennsylvania Supreme Court would rule if presented with the facts of this case. Since Cauley died on October 23, 1999, which is more than ninety-one days after his coverage terminated in mid January 1999 (at the latest), Provident is not liable for the benefits Tucker seeks.

This Court recognizes the equitable concerns associated with Cauley's continued payment of his premiums during the ten month period he was away from work.[11] However, in the deposition attached to the parties' motions, the Bipartisan Committee's personnel supervisor believed Provident was going to reimburse the appropriate parties for the payments made. If this in fact did happen, the major equitable concern disappears. Even if Provident retained the premiums, it is not an issue raised by Tucker and is not properly before this Court. Moreover, it appears to be a claim better brought by Cauley's estate and/or the Bipartisan Committee, the parties who made the payments, not Tucker, the beneficiary of the policy.

---

[11] This Court notes that the Bipartisan Committee, as administrators of the plan, could have presented Cauley's situation to Provident and inquired about his status. Moreover, Cauley himself could have read his policy and asked Provident about his continued coverage.

11

## IV.   Order

**AND NOW**, therefore, **IT IS ORDERED THAT:**

1. Defendant's motion for summary judgment is **GRANTED**.

2. Plaintiff's motion for summary judgment is **DENIED**.

3. Judgment shall be entered for Defendant and against Plaintiff.

4. This Court finds, determines, and holds that Defendant Provident Life and Accident Insurance Company has no legal obligation to provide life insurance benefits to Plaintiff Carolyn Tucker under policy number P-374-0213.

5. The Clerk of Court shall close the file.

_____
Yvette Kane
United States District Judge

Dated: March 28, 2002